NISSAN MOTOR COMPANY, LTD. aka Nissan Motor Company, and Nissan Motor Corporation in U.S.A., Appellants,

v.

Marian ARMSTRONG, Appellee.

No. 14–98–00775–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 21, 2000.

Rehearing Overruled Dec. 7, 2000.

P. Michael Jung, Alan Brandt Daughtry, Leslie G. Landau, Houston, for appellants.

Donald G. Wilhelm, Grant Kaiser, Houston, for appellee.

Panel consists of Justices SEARS, DRAUGHN and EVANS.*

## OPINION

FRANK G. EVANS, Justice (Assigned).

Nissan Motor Company, Ltd., a/k/a Nissan Motor Company, and Nissan Motor Corporation in U.S.A. (Nissan) appeal from a judgment in favor of Marian Armstrong awarding damages for personal injuries sustained in an "unintended acceleration" or "stuck throttle" accident involving her 1986 Nissan 300ZX automobile.

The jury found that Nissan was negligent and that such negligence proximately caused the accident. The jury also found a defect in the design, manufacture, and marketing of the vehicle, and that each such defect was a producing cause of the accident.

The jury further found that: (1) Nissan had negligently misrepresented to the public that the vehicle was "safe and technologically advanced" and that such negligent misrepresentation was a producing cause of the accident; (2) Nissan had fraudulently concealed or failed to disclose known material facts, which resulted in Ms. Armstrong's injury; (3) Nissan had engaged in false, misleading or deceptive acts or practices and in unconscionable acts, which were a producing cause of Ms. Armstrong's damages; (4) Nissan had breached its warranties to Ms. Armstrong relating to the fitness and suitability of the vehicle for its intended purposes, and (5) Nissan had knowingly engaged in such false, deceptive, and unfair conduct. The jury found no contributory negligence on the part of Ms. Armstrong.

* Senior Justices Ross A. Sears, Joe L. Draughn and Frank G. Evans sitting by assignment.

In response to the damage issues, the jury found that Ms. Armstrong was entitled to $325,000 for past physical pain and mental anguish, loss of earning capacity, physical impairment, and medical care, $575,000 for future damages, and that Nissan was guilty of gross negligence. The parties stipulated punitive damages to be in the sum of $2,000,000, but the trial court ordered a remittitur reducing that amount by $800,000. The trial court also granted judgment n.o.v. on the issues of fraud, negligent misrepresentation, breaches of warranty and DTPA violations and entered judgment in favor of Ms. Armstrong for the total sum of $2,431,938.90.

On this appeal, Nissan asserts four major complaints: (1) that the actual damages award cannot stand because the evidence is legally and factually insufficient to prove either a design, manufacturing, or marketing defect; (2) that the punitive damages award cannot stand because the evidence does not show that Nissan's vehicle posed an "extreme risk" or that Nissan had "subjective knowledge" of the risk; (3) that there is no legal or factual basis for the court's negligence per se instruction, and (4) that the trial court erred in admitting evidence of other "unintended acceleration" incidents to show that Nissan's vehicles had a history of such problems.

**The Accident**

Ms. Armstrong acquired her 1986 Nissan 300ZX sports car in 1992, receiving title from her parents as partial compensation for her work in the family business. Ms. Armstrong's mother had previously driven the car for about five years, and at the time of the accident, the vehicle's odometer registered 93,000 miles. There was testimony that because the vehicle was Ms. Armstrong's first "new" car, she took excellent care of it. She treated the car "like a baby" and would let no one else drive it. The car was consistently garaged and all maintenance was done according to the service booklet instructions.

Ms. Armstrong testified that on October 9, 1992, the day before her accident, she had been driving on the freeway going to work. She said her car "started accelerating" and "seemed to just kind of take off faster." She pulled to the side of the road and turned off the engine. She restarted the car and noticed no further problems at that time.

On the day of her accident, Ms. Armstrong drove her car to work and parked it in the parking lot next to the office building where she worked. She said the engine had sounded normal when she shut it off that morning and also when she started it again that afternoon. After starting the engine, she took her foot off the brake and "barely touched" the accelerator. The car began to "rev up" and accelerate backwards across the parking lot. She stepped on the brake as hard as she could, but the car continued to accelerate out of control. After the car crossed the parking lot in reverse at about 10 miles per hour, it crashed into the side of the brick office building and stopped. Ms. Armstrong shifted the car into "drive" to pull away from the building so she could determine the extent of the damage. After taking her foot off the brake, she once again "barely touched" the accelerator pedal. This time, the car "shot forward" and again began to accelerate out of control. Although Ms. Armstrong "stood on the brake with all her might," the car crossed the parking lot at a speed of 15–18 miles per hour and crashed into a telephone pole at the edge of the lot. The impact crushed the car's hood in some 22 inches, broke the windshield, and disabled the engine. Ms. Armstrong suffered two broken bones in her foot and developed a nerve condition known as reflex sympathetic dystrophy. As a result of her injuries, she had to be hospitalized on a number of occasions for this condition, and was required to undergo more than 30 nerve block injections into her spine.

**Post–Accident Investigation**

Ms. Armstrong's car was towed to a repair shop after the accident, where it

remained for several months. During the following summer, when a family friend tried to move the repaired vehicle out of the driveway, it just "took off" and accelerated uncontrollably. After this incident, Ms. Armstrong's father contacted the manager of an automobile repair shop, "The Z Place," which specialized in the repair of Nissan ZX automobiles. The shop manager told Mr. Armstrong he was familiar with the cause of the sudden acceleration problem and suggested that Mr. Armstrong look at the throttle cable and cut off the plastic dust boot so it would not get caught in the accelerator system. When Mr. Armstrong examined the throttle cable, he saw the plastic boot was hard and cracked and that it was sliding back and forth on the cable. He pulled or cut pieces of the boot off the cable and threw them away. He also saw that a "milky white colored" piece of plastic underneath the boot was frayed and he trimmed the frayed part and threw it away. He then took the car to The Z Place where it was examined by the shop manager and one of his mechanics. The shop manager told him the cause of the sudden acceleration was the throttle boot breaking away and becoming lodged in the accelerator system. He said he had seen this type of failure many times, both before and after Ms. Armstrong's accident. The shop manager replaced the cable and boot, tested the vehicle, and said the problem was solved. He showed Mr. Armstrong several other ZX cars with similar boot failures and estimated that 40% of the Nissan ZX cars seen at his repair shop had fractured dust boots.

**Similar Experiences of Other ZX Owners**

Several owners of Nissan ZX automobiles testified they had experiences similar to those of Ms. Armstrong.

Gary Lysdale, a 58 year old retired airline pilot with experience as an automobile and aircraft mechanic, had owned a 1986 300ZX automobile. When he put his car in reverse, it had gone full throttle backwards out his driveway and into the street. He tried to stop the car, but could not do so. When he later looked over the control cables, he found that a small rubber boot was loose and could physically be moved up to the throttle cam, where it would stick.

Linda Faust, a 55 year old law enforcement officer who had investigated hundreds of accidents as a police officer, said she bought her new 300ZX in 1985. She had maintained the vehicle according to Nissan's maintenance schedule, but two years later, after she had driven the car 21,000 miles, it started to "rev up" one day and created an "incredible noise." She was unable to stop the vehicle, even by pushing both feet on the brake pedal and pulling up on the emergency brake. As the result of her accident, she sustained two ruptured discs in her neck, required an ulnar nerve transplant in her arm, and sprained both ankles. She said she had traveled from her home in California at her own expense to testify at Ms. Armstrong's trial, because she felt "so strongly that these cars are dangerous and they need to be fixed properly."

Martha Ham testified she was driving her Nissan 300ZX automobile with only 1,500 miles on it, when it suddenly accelerated, forcing her to "bail out" before it ran into a ditch.

Paul Roupinian, a California stockbroker, testified that he had maintained his ZX perfectly according to Nissan's maintenance schedule. In December 1997, he started his car and backed it out of the garage. When he put his foot on the brakes, it jerked but did not stop. He was so scared he threw it out of gear and pulled the emergency brake. After it finally stopped, he jumped out; it was "going crazy" with nobody in it: "It was going about 7000 rpms with nobody in the car." Later the same day, the car seemed "to go crazy again" and it was doing "some weird things" where the engine was revving on its own.

In addition to the testimony of these witnesses, Ms. Armstrong offered reports of hundreds of ZX unintended acceleration and stuck throttle incidents occurring both before and after the date of the sale of her car. One report showed that as early as March 1, 1986, a 1985 Nissan ZX had crashed, burned and killed its driver. According to Nissan's records, the car's owner had failed to inform the driver about the problem of the throttle sticking. A month later, on April 28, 1986, one of Nissan's dealer service directors reported two sudden accelerations on a brand new ZX automobile. According to the report, the engine started fine and idled fine, but when the driver shifted from park to drive, the engine went to "wide open throttle." After the driver turned off the engine and started it again, it idled fine until the driver shifted into drive. Again the car went into "wide open throttle," crashing into a parked car. Over the next ten years, Nissan recorded numerous reports of similar incidents, including its own internal technical reports which indicated the dust boot on the throttle cable would deteriorate and separate from its base, allowing it to slide forward and jam itself between the throttle cable and accelerator drum, thus preventing the throttle returning to neutral. Among these reports was a 1996 report from an independent engineering group, tending to confirm the deteriorating dust boot as being the cause of the problem. The report states that the broken plastic boot caused the accelerator to bind and that the harder it was pulled, the tighter the wedging action of the broken part became. According to the report, this was a reoccurring event.

### The Expert Testimony

Ms. Armstrong called Mr. Neil Mizen as an expert witness. Mr. Mizen held a master's degree in mechanical engineering and had experience in vehicle dynamics, design, and performance based on work at Cornell Aeronautical Laboratory. He also had experience in applying computers to control machinery, accident reconstruction, and body dynamics through his work for the insurance industry. He was a member of the American Society of Mechanical Engineers (ASME), a former member of the Society of Automotive Engineers (SAE), and had presented papers at SAE meetings. He said he had worked as a mechanical engineer and spent a significant part of his career in that specialty.

Mr. Mizen testified that he had reviewed pertinent Nissan documents, depositions, photographs, and videotapes, along with reports and tests made in other incidents, and documents submitted by Nissan to the National Highway Traffic Safety Association (NHTSA). Mr. Mizen said that in his opinion Ms. Armstrong's accident had been caused either by a cruise control defect or a throttle cable failure. Regarding the throttle control problem, Mr. Mizen explained that if the boot on the throttle cable became loose, it could bind at the bell crank and prevent the accelerator pedal from closing. He said Nissan had redesigned the throttle cable in 1995, shortening the boot and eliminating the underlying white lining, and this new design had solved the problem. He said the safer design cost Nissan only $10.66 per unit and that the new design had been technically feasible at the time Ms. Armstrong's vehicle was manufactured. Mr. Mizen concluded that the 300ZX was defective in design, manufacture, and marketing, and that the vehicle was unreasonably dangerous and had caused Ms. Armstrong's damages.

■ On appeal, Nissan contends that Mr. Mizen was not properly qualified as an expert witness and that his opinions were "based on nothing" and therefore were unreliable. Nissan argues that Mizen was not an automotive engineer, had never designed any car part, and had no background in injury causation. Pointing to Mizen's admission that he had not performed any tests of the throttle cable components, Nissan complains that Mizen's testimony does not rise to the level of admissible expert testimony required by

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557–59 (Tex.1995). In essence, Nissan argues that Mizen's education and training as a mechanical engineer did not equip him to render an expert opinion about the cause of the sticking throttle on Ms. Armstrong's automobile. In support of this argument, Nissan relies on *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 721–22 (Tex.1998)("Not every mechanical engineer is qualified to testify as an expert in every products liability case.").

■ We disagree with Nissan's argument. The trial court determined that Mizen was qualified to testify as an expert, and we cannot overturn the trial court's ruling absent a clear abuse of discretion. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex.1996). Qualification of an expert witness is strictly within a trial court's discretion, and the court's ruling will not be set aside unless the court acted without reference to any guiding rules or principles. *See United Blood Services v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997).

■ Tex.R. Evid. Rule 702 permits the testimony of a witness qualified as an expert by knowledge, skill, experience, training or education to testify on scientific, technical or other specialized subjects if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. The party offering an expert's testimony has the burden of showing that the witness possesses such "special knowledge as to the very matter on which he proposes to give an opinion." *Broders,* 924 S.W.2d at 154.

■ A witnesses' qualifications as an expert must be judged by the facts of the particular case. *See Gammill,* 972 S.W.2d at 722. In some instances, the nature of the design or manufacturing defect may be so complex as to require the expert analysis of a person highly skilled and experienced in that specific automotive component; in other instances, the area of expertise may be relatively simple and straightforward. *See id.* at 726 (recognizing that in non-scientific cases, it is impossible to set out specific criteria for evaluating the reliability of an expert witness). Indeed, experience alone can provide a sufficient basis for an expert's testimony in some cases. *Id.*

Here, the evidence shows that Mizen had a masters degree in mechanical engineering, worked for many years as a mechanical engineer, and had experience in vehicle dynamics, design and performance. The alleged defect about which he rendered an opinion relates to a relatively simple automotive component, the throttle control cable, which did not require an explanation from a "rocket scientist" for the jury to understand. Indeed, almost any qualified mechanical expert could show the jury how the cable worked and how a loose dust boot might stick on the throttle cable and prevent the accelerator mechanism from closing. *See Gammill,* 972 S.W.2d at 727; *see also The Kroger Co. v. Betancourt,* 996 S.W.2d 353 (Tex.App.—Houston [14th Dist.] 1999, rev. denied). As a result, we find the trial court did not err in its evaluation of the methods, conclusions, and principles relied upon by Mizen in reaching his opinion and in concluding that Mizen's opinion met the fundamental requirements of reliability and relevance of Rule 702. *See Gammill* at 726. As distinguished from *Gammill,* the record in this case does not demonstrate an "analytical gap" between Mizen's expert analysis and the data he relied upon in making that analysis. Thus, the trial court did not abuse its discretion in holding that Mizen was qualified to testify as an expert witness. *See Gammill* at 727; *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

■ We further conclude that Nissan has failed to demonstrate, even assuming erroneous admission of Mizen's testimony, that such error probably resulted in an

improper judgment. To obtain reversal of a judgment based on error in the admission of testimony, a party must show that the trial court's ruling probably caused the rendition of an improper judgment. TEX. R.APP. P. 44.1; *Southland Lloyd's Insurance Co. v. Tomberlain*, 919 S.W.2d 822, 827 (Tex.App.-Texarkana 1996, writ denied); *see also Church & Dwight Co., Inc. v. Huey*, 961 S.W.2d 560, 570 (Tex.App.—San Antonio 1997, rev. denied). Here, the jury could have decided, based on the entire record and aside from Mizen's testimony, that the throttle cable system on Nissan's ZX series was defective and that such defect was the cause of Ms. Armstrong's injury. *See The Kroger Co. v. Betancourt*, 996 S.W.2d at 363. We conclude from the entire record that no reversible error has been shown.

**Time of Defect**

■ Nissan contends, in effect, that the throttle cable's deterioration after six years and 93,000 miles of driving does not constitute any evidence of a design defect existing at the time the vehicle was purchased. Citing authorities from other jurisdictions, Nissan argues that a manufacturer has no duty to design products with component parts that will never wear out, citing *Kuiper v. Goodyear Tire & Rubber Co.*, 207 Mont. 37, 673 P.2d 1208, 1222 (1983).

■ We overrule Nissan's contention. Under Texas law, the age and condition of the throttle components were simply relevant factors to be considered by the trier of facts. *See Sharp v. Chrysler Corp.*, 432 S.W.2d 131, 136 (Tex.Civ.App.Houston [14th Dist.] 1968, writ ref'd n.r.e.); *USX Corp. v. Salinas*, 818 S.W.2d 473 (Tex. App.—San Antonio 1991, writ denied). If a manufacturer places into the channels of trade a product so fragile that its anticipated use is likely to create a dangerous condition, it has distributed a defective product. *Sharp*, 432 S.W.2d at 136. Here, the jury was asked whether the 1986 300ZX vehicle had a design defect at the time it left Nissan's possession. The charge defined the term "design defect" as a condition that rendered the product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. The jury could reasonable have inferred from the evidence, including the testimony of Nissan's own manager of engineering analysis and Nissan's own internal reports, that the design defect existed at the time of the Armstrong sale.

**Causal Connection**

■ Nissan next argues that Ms. Armstrong failed to meet her burden of establishing a causal connection between the allegedly defective condition and her injuries or damages. In making this argument, Nissan contends that Mizen's expert testimony showed only that the loose throttle boot "could have" caused the throttle to remain open, not that it probably did so. Thus, Nissan argues, the defective condition itself is not evidence that the condition caused the accident, citing *Houghton v. Port Terminal R.R. Association*, 999 S.W.2d 39, 50–51 (Tex.App.—Houston [14th Dist.] 1999, no pet.).

Nissan's proposition ignores the evidence presented. The evidence showed that Ms. Armstrong's accident occurred as the result of one of two possible causes: (1) her inadvertent use of the gas pedal instead of the brake pedal, or (2) a malfunction in the car's accelerator system caused by a defective cruise control or a defective throttle control component. Under the second possibility, Nissan would be liable as the designer and manufacturer of the vehicle.

■ It has long been the law in this state that if an injury results from one of two causes, or from causes combined, and if such cause would not have existed except for the defendant's negligence, the defendant will be liable unless there has been some failure on the part of the plaintiff to exercise due care. *City of Galveston v.*

*Posnainsky,* 62 Tex. 118 (1884); *Sharp v. Chrysler Corp.,* 432 S.W.2d at 135 (plaintiff is not required to exclude "an appreciable chance" that the event might have occurred in some other way—a causal connection may be inferred from a "balance of probabilities."). Here, the jury found no negligence on the part of Ms. Armstrong, and this finding left only Nissan as the potential cause of the accident. *See Bell Aerospace Corp. v. Anderson,* 478 S.W.2d 191 (Tex.Civ.App.—El Paso 1972, writ ref'd n.r.e.).

■ Nissan also criticizes the legal sufficiency of the evidence to support Mizen's expert testimony about the probable cause of the unintended acceleration. Nissan argues, among other things, that Mizen's "stuck-throttle" theory required proof that Ms. Armstrong did something more than just "barely" press her foot on the accelerator and that his theory assumed a racing engine, while Ms. Armstrong said her engine had idled normally before the accident. In effect, Nissan argues that Mizen's expert testimony was based on assumed facts that are materially at variance with the evidence presented at trial. We overrule these arguments, concluding that they simply bear on the weight to be accorded Mizen's testimony.

■ Finally, Nissan argues that the hearsay reports of other incidents of unintended acceleration, even if admissible, prove nothing. None of these 750 reports, says Nissan, shows that the unintended acceleration was due to a faulty boot or liner, and that only a handful suggest any such cause at all. Further, all reports relate to incidents that occurred *after* Ms. Armstrong's accident.

We disagree with Nissan's analysis of this circumstantial proof. As discussed below, we consider the evidence to be admissible and entitled to such weight as the jury might accord it. Although most of the incident reports did not attribute a technical cause for the unintended acceleration, the sheer number and nature of reported incidents raise an inference that the unintended acceleration or stuck throttle was caused by something other than driver error. In making a "balance of probabilities" determination, the jury was entitled to consider the reported incidents as some proof, albeit circumstantial, that Ms. Armstrong's vehicle accelerated rapidly without her foot depressing the accelerator pedal.

■ We conclude there is both legally and factually sufficient evidence to support the jury's findings on liability and that Nissan has failed to demonstrate that the jury's findings are so against the great weight and preponderance of the evidence as to require a reversal and remand of this case.

**Punitive Damages**

At trial, a Nissan official admitted that Nissan had incident reports in its internal files showing that the throttle boots on its 300ZX cars could fail, become dislodged, and cause unintended acceleration or stuck throttles in those vehicles. Nissan also admitted that, despite this knowledge, it had issued no warnings or instructions for the mandatory replacement of the throttle cable components, nor did it advise its authorized service facilities to examine throttle cables for specific signs of failure. In short, Nissan did nothing to inform its dealers and service facilities about the potential causes of sudden acceleration or stuck throttles.

In 1987, the National Highway Traffic Safety Administration (NHTSA) started an informal investigation of the large number of complaints it had received of unintended acceleration of ZX automobiles. In response, Nissan voluntarily recalled the 1979–1987 models to install a "shift interlock system," which required drivers to place their foot on the brake before shifting out of park into reverse or drive. This, however, did not alleviate all reports of throttle cable problems on ZX automobiles, and Nissan continued to receive complaints about sudden acceleration and

stuck throttle incidents, accidents, and injuries relating to those vehicles.

In sum, the evidence showed that Nissan had within its possession and knowledge numerous documented reports of incidents of unintended acceleration and stuck throttles caused by throttle cable boot failure and that Nissan never advised NHTSA or its own customers about these potential safety issues. Indeed, the evidence is undisputed that despite receiving continuing reports of unintended acceleration or stuck throttles due to throttle failure, which resulted in 79 accidents, 38 injuries, and 3 fatalities, Nissan took no action to warn its customers or its dealers about safety concerns relating to these vehicles. Based on this evidence, the jury could reasonably have concluded that Nissan, despite knowledge of a defect, had failed to take any action or sufficient action to correct the problem or to warn its customers or the public about the danger. *See Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994).

 We find there is legally and factually sufficient evidence to support the jury's finding that Nissan was guilty of gross negligence, having evidenced such "an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to the rights, welfare, or safety of the persons affected by it." Contrary to Nissan's argument, evidence of other incidents, both pre-sale and post-sale, were relevant and admissible to establish a pattern of conduct on the part of Nissan in dealing with the defective throttle cable problems, and to establish Nissan's knowledge and conscious indifference to the problem "after all the facts were known." *See, e.g., Firestone Tire & Rubber Co. v. Battle,* 745 S.W.2d 909, 912 (Tex.App.—Houston [1 st Dist.] 1988, writ denied).

 We also disagree with Nissan's position that NHTSA's finding of "no safety related defect" in its report precluded a jury finding of gross negligence. It is undisputed that Nissan did not advise NHTSA of the dust boot and throttle cable problem, and the jury was not bound by NHTSA's determination based solely on the information given to it by Nissan.

## Negligence Per Se Instruction

In connection with the negligence issue, the trial court instructed the jury that Nissan had the duty to warn the federal government and Nissan's customers when it learns its vehicle contains a defect and decides in good faith that the defect is related to motor safety. *See* 49 U.S.C. § 30118(c)(1). Nissan, contending that it had no common law post-sale duty to warn, argues that (1) the instruction violates Texas law because the federal statute forming the basis for such instruction does not impose a duty that is sufficiently clear and absolute, and (2) there is no evidence Nissan learned of the defect before the date of Ms. Armstrong's sale and no post-sale duty to warn exists at common law, citing *Perry v. S.N.,* 973 S.W.2d 301, 305–309 (Tex.1998).

It is not imperative that we decide this issue because of our holding that the evidence supports the jury's findings on the products liability issues. We note, however, that the Fifth Circuit Court of Appeals, in construing the predecessor statute to 49 U.S.C. § 30118, held that the statute was sufficiently clear to warrant the giving of a negligence per se instruction. *Lowe v. General Motors Corp.,* 624 F.2d 1373 (5 th Cir.1980) (applying Alabama law).

## Evidence of Other Incidents

Nissan contends the trial court erred in allowing Ms. Armstrong to "create an appearance of defect with a mountain of unproved unintended acceleration incidents" and that the prejudice resulting from this evidence was overwhelming. In essence, Nissan argues: "An incident of unintended acceleration without evidence of its cause is not evidence of a defect, particularly where the recognized most-common cause is pedal error."

We agree with Nissan's argument that the admission of such a high volume of other unintended acceleration incidents was prejudicial to its claims asserted at trial. However, we disagree with Nissan's arguments that the trial court abused its discretion in deciding to admit the evidence.

First, in products liability cases, evidence of other accidents involving the same product is admissible if such accidents occurred under reasonably similar, but not necessarily identical, circumstances to those surrounding the litigated event. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 341 (Tex.1998). In applying this rule, courts have noted that the "requisite degree of similarity is plainly not very high." *See McInnes v. Yamaha Motor Corp., U.S.A.*, 659 S.W.2d 704, 709 (Tex.App.—Corpus Christi 1983), aff'd, 673 S.W.2d 185 (Tex.1984), cert. denied, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). For instance, in *Magic Chef, Inc. v. Sibley*, 546 S.W.2d 851, 855 (Tex.Civ.App.—San Antonio 1977, ref'd n.r.e.), the only significant shared characteristics justifying admissibility were the brand of gas range and the inadvertence of ignition.

Nor is it a controlling issue for admissibility that the other accident reports were based on allegations or claims, without proof as to causation. *See McEwen v. Wal–Mart Stores, Inc.*, 975 S.W.2d 25 (Tex.App.—San Antonio 1998, review denied). The fact that causation in the other complaints has not been proven with absolute certainty goes to their weight, not their admissibility.

Second, the evidence was admissible to counter Nissan's claim that the cause of Ms. Armstrong's accident was her own driver error. The jury could reasonably have concluded from this "mountain" of related incidents that it was more probable than not the unintended acceleration had been caused by some mechanical malfunction, not by some error on the part of the driver. Third, the record reflects that Nissan itself offered evidence of other incidents of unintended acceleration due to throttle failure in ZX cars. The trial court could have decided that Nissan failed to preserve its objections to this type of evidence and that the evidence was simply cumulative of other evidence received without objection. Moreover, we note that Nissan's objections on appeal to some of the "other incident" evidence do not comport with the objections asserted by Nissan at trial.

Fourth, we conclude that the evidence of similar incidents was admissible to show Nissan's knowledge of the dangerous condition in its vehicles. *See General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 596 (Tex.1999). Although Nissan tried unsuccessfully to limit the purpose of this evidence, we conclude that the trial court did not abuse its discretion in allowing the evidence without limiting instructions. Accordingly, we overrule Nissan's complaints regarding the admissibility of such evidence.

**Trial Court Remittitur**

Ms. Armstrong complains that the trial court erred in ordering a remittitur in the amount of $800,000 out of the stipulated damage award of $2,000,000. She argues that by making this stipulation, Nissan waived its right to have the jury find the amount of exemplary damages and agreed that the correct amount of such damages would not be the subject of appeal. She further argues, in effect, that the court approved this stipulation and was bound by it as having support in the evidence. *See Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex.1987)(trial court may order a remittitur only on insufficiency of evidence, not on an abuse of discretion standard).

A trial court has the constitutional duty to independently scrutinize punitive damage awards for excessiveness. *BMW of North America v. Gore*, 517 U.S.

559, 574, 116 .S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *see also Alamo National Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). Accordingly, the trial court is not bound to accept a stipulation of evidence as conclusive in determining whether a remittitur is appropriate under all the circumstances of a given case. We accordingly overrule Ms. Armstrong's complaint.

**Fraud, Misrepresentation and DTPA Claims**

■ Ms. Armstrong also contends the trial court erred in granting Nissan's motion for judgment notwithstanding the verdict on the jury's findings of fraud, misrepresentation, and violations of the Deceptive Trade Practices Act. She argues that Nissan committed fraud by concealing and failing to disclose material facts regarding the ZX automobile and its propensity for sudden and unintended acceleration; that Nissan misrepresented its product in public advertisements, which she relied on to her detriment, and that Nissan knowingly violated the DTPA and engaged in unconscionable acts for which she was entitled to retribution as a consumer.

We need not decide these issues because of our holding affirming the judgment on the products liability issues. The award of actual and exemplary damages provides full and adequate compensation to Ms. Armstrong for the injuries and damages suffered in the accident.

The judgment is affirmed.