# Supreme Court of Texas

No. 22-0288

Andrew Jackson,

*Petitioner*,

v.

Kristen C. Hitchcock Takara, as Representative and Independent Administratrix of the Estate of Reuben Blair Hitchcock,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**PER CURIAM**

The decedent in this case, Reuben Hitchcock, fell to the ground while he was standing in a tractor's front-end loader and trimming his neighbor's tree. He was hospitalized and died about a month later. Hitchcock's estate sued the neighbor, Andrew Jackson, asserting Jackson was negligent in ignoring product safety warnings and allowing Hitchcock, who suffered lifelong intellectual deficiencies, to trim the tree in that manner and with no safety harness.

The jury failed to find any negligence of either Jackson or Hitchcock proximately caused Hitchcock's fall, and the trial court

rendered a take-nothing judgment. A divided court of appeals reversed and remanded for a new trial, holding that the trial court's admission of the lay testimony of another neighbor, Valerie McElwrath, constituted harmful error. We hold that the court of appeals erred both in concluding that the trial court abused its discretion by admitting McElwrath's testimony and in determining that the admission of her testimony probably caused the rendition of an improper judgment. We therefore reverse the judgment of the court of appeals and render judgment for Jackson.

In 2018, Reuben Hitchcock was a 52-year-old resident of Milam County. He had no family nearby. He was in contact with his sister and had recently reconnected with his biological mother, but both lived outside Texas and did not regularly visit. Hitchcock had lived for a number of years with his many dogs in a trailer on property owned by McElwrath's family. It is undisputed that Hitchcock had a low IQ and an elementary-school level reading ability. As an adult, Hitchcock had been hit by a car while bicycling, and this accident caused him to walk with a limp and endure regular back pain. Nevertheless, Hitchcock did odd jobs—like fence painting and tree trimming—to supplement his social security disability income. Although he earlier maintained a Texas driver license, in the later years of his life, he got around atop a riding lawnmower with an attached trailer advertising his services. It read "Country Boy Maintenance" and displayed the phone number at which he could be reached.

Jackson, who was retired, estimated that he had hired Hitchcock forty to fifty times over the years to do various odd jobs. He surmised

2

that, of those jobs, approximately fifteen involved tree trimming on Jackson's property, sometimes using the front-end loader, or bucket, of Jackson's tractor as a work platform. The men were not close friends, but Jackson occasionally drove Hitchcock to get groceries or pick up a prescription. In the months leading up to Hitchcock's fall, the two had discussed trimming a particular tree on Jackson's property until Hitchcock arrived at Jackson's home one evening, unannounced, ready to trim the tree.

Jackson testified that Hitchcock suggested the best way to reach the target branch was to raise Hitchcock up in the tractor's bucket. Jackson drove the tractor over and positioned it according to Hitchcock's suggestion. Hitchcock put his chainsaw in the bucket, then sat down in it before Jackson raised it ten to fourteen feet above the ground. Jackson put the tractor in park, turned it off, and stood nearby. When the limb was partially cut, Hitchcock asked Jackson to get a rope. Jackson tossed the rope to Hitchcock and stepped away. It was then that Hitchcock fell from the bucket to the ground. He took some time to catch his breath and rest. Jackson then brought him a chair and some ibuprofen, and after a while, Hitchcock began talking about how Jackson could finish the job. The men did not finish the tree trim—instead, Hitchcock drove his mower and trailer home.

Later that night, Hitchcock called for an ambulance. He was hospitalized for about a month, during which time his sister and biological mother visited from Louisiana and Colorado. In light of Hitchcock's deteriorating condition, the physicians' expectations that Hitchcock would likely require substantial rehabilitative or nursing

home care, and his sister's belief that Hitchcock would not want to live in such an institution, his sister ultimately authorized the hospital to discontinue life-supporting care. Hitchcock died two days later.

Hitchcock's sister, Kristen Takara, sued Jackson in her capacity as representative and independent administrator of Hitchcock's estate. She alleged Jackson was negligent and grossly negligent for failing to provide Hitchcock safety equipment, failing to train Hitchcock, failing to hire a professional tree trimmer, and failing to comply with the tractor's written warnings. Takara called four witnesses in her case-in-chief. She testified first, emphasizing the severity of Hitchcock's intellectual limitations and the physical injuries he had sustained in his bicycle accident ten years earlier. The theme of her case was that Jackson took advantage of Hitchcock.

Takara next called a psychologist who evaluated Hitchcock after his bicycling accident. He told the jury that Hitchcock scored well below average—in the tenth percentile—on an IQ test and that he could not read beyond a third-grade level or manage his financial affairs. But he also opined that, even among people with an IQ score like Hitchcock's, individuals' functionality levels vary, such that some are capable of managing their financial affairs, while others with higher IQ scores may be incapable of doing so. The psychologist also noted that although facts Hitchcock reported were not always accurate, he was coherent and rational on most topics.

Takara then called Jackson, who described the events leading up to and following Hitchcock's fall and characterized Hitchcock as capable despite his limitations. Finally, Hitchcock's birth mother testified about

4

visiting Hitchcock when he was hospitalized, telling the jury Hitchcock was experiencing pain despite being in a medically induced coma. On cross-examination, Jackson's counsel pointed the jury's attention to one among thousands of pages of admitted medical records. Defendant's Exhibit 16, the Final Report of the emergency department, reflected that a mere three hours after the fall, Hitchcock attributed his fall not to any conduct of Jackson's but, rather, to Hitchcock's own loss of balance.

Before she rested, Takara moved the trial court to exclude McElwrath from testifying on the ground that Jackson did not disclose her as a person having knowledge of relevant facts until two weeks before trial. Takara also argued Jackson's untimely disclosure was substantively deficient insofar as it omitted McElwrath's address and phone number and described McElwrath only as a neighbor, without detailing the topics on which she would testify. Takara's counsel added that he called McElwrath on the phone after Jackson disclosed her, but McElwrath never returned the calls. In response, Jackson's counsel told the trial court that McElwrath was timely disclosed under counsels' agreement to extend the discovery period. Jackson's counsel also stated that Takara's counsel went to McElwrath's home, which was on the same property where Hitchcock lived, when he inspected Jackson's property. Jackson's counsel asserted that Takara was "very much aware" of McElwrath and brought her up multiple times during Takara's deposition. The trial court denied the motion to exclude and found there was no unfair surprise or unfair prejudice to Takara, adding that she "had reasonable notice of the possibility that [McElwrath]

would testify" and that she "was certainly aware of [McElwrath] and her involvement with the decedent" and his capabilities.

McElwrath was Jackson's sole witness. She told the jury that she and her parents had known Hitchcock for fifteen years and that she saw Hitchcock frequently. Like Jackson, McElwrath testified that Hitchcock was capable and mechanically inclined despite his intellectual limitations. She also told the jury that it is not uncommon for people to use a front-end loader as a work platform and that she had probably done so herself. McElwrath testified that Hitchcock had mentioned to her that his "policy" was he was comfortable using a front-end loader as a work platform as long as nobody was in or operating the tractor at the time.

The jury returned a unanimous verdict in less than fifty minutes, and the trial court rendered a take-nothing judgment on the jury's verdict. Takara appealed, challenging the legal and factual sufficiency of the evidence and the admission of McElwrath's testimony. 640 S.W.3d 293, 297 (Tex. App.—Houston [14th Dist.] 2021). The court of appeals panel unanimously rejected Takara's sufficiency challenges because, even assuming Jackson acted negligently, there was sufficient evidence that his negligence was not a proximate cause of Hitchcock's fall. *Id.* at 301-03. But the panel disagreed about whether Rule of Civil Procedure 193.6(a) required exclusion of McElwrath's testimony. *See* TEX. R. CIV. P. 193.6(a) (barring a party from offering the testimony of a witness who was not timely identified unless the court finds good cause for the untimely disclosure or the failure to timely disclose would not cause unfair surprise or unfair prejudice). The majority rejected

6

Jackson's contention that the parties had agreed to extend the discovery deadline because the purported agreement was neither written nor filed as part of the court's record. 640 S.W.3d at 304-05 (citing TEX. R. CIV. P. 11); *see* TEX. R. CIV. P. 191.1 (allowing parties to modify discovery rules by agreement but noting such an agreement is unenforceable unless it "complies with Rule 11" or is made part of the record in a deposition). And it disregarded the assertions by Jackson's counsel that Takara repeatedly referred to McElwrath in Takara's deposition because the relevant deposition testimony was not included in the record. 640 S.W.3d at 305. The court concluded the record did not contain evidence that Takara "was aware that Jackson considered McElwrath to be a person with knowledge of relevant facts" and thus Jackson failed to establish a lack of unfair surprise or unfair prejudice. *Id.* Finally, it concluded the trial court's error in admitting McElwrath's testimony was harmful because Hitchcock's physical and intellectual capabilities were a central issue at trial and McElwrath was the only disinterested witness who saw Hitchcock regularly enough to testify about them. *Id.* at 306-07. The majority particularly took issue with McElwrath's testimony that Hitchcock had a "policy" regarding the use of a tractor bucket as a work platform, noting Takara had no reason to discover such a policy before trial and no evidence in the record supported its existence. *Id.* at 307.

The dissenting justice would have held the trial court did not err in finding Takara was not unfairly surprised or unfairly prejudiced by McElwrath's testimony because Takara knew McElwrath and knew that she had knowledge of relevant facts about Hitchcock's life and

7

capabilities. *Id.* at 309 (Christopher, C.J., dissenting). The dissenting justice also concluded that, even assuming admission of McElwrath's testimony was erroneous, it was cumulative of Jackson's and therefore not harmful. *Id.* The court of appeals reversed and remanded for a new trial, *id.* at 308, and Jackson petitioned this Court for review.

We conclude the court of appeals erred in holding the admission of McElwrath's testimony was an abuse of discretion. Under Rule 193.6, a party may not offer testimony from a witness that was not timely identified unless the trial court finds that (1) there was good cause for the failure or (2) the failure "will not unfairly surprise or unfairly prejudice the other parties." TEX. R. CIV. P. 193.6(a). Thus, once it is determined that the witness was not timely designated, a trial court must inquire whether there is (1) good cause for failing to timely identify the witness or (2) a lack of unfair surprise or unfair prejudice. A court of appeals reviews a trial court's decision under Rule 193.6(a) for abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) ("We review a trial court's decision to admit or exclude evidence for an abuse of discretion.").

The court of appeals misapplied Rule 193.6(b)'s requirement that a finding of no unfair surprise or no unfair prejudice "must be supported by the record," TEX. R. CIV. P. 193.6(b), by unduly excluding material about the discovery process that the trial court had before it as a basis for its decision. The trial court was free to find that Takara was not unfairly surprised based on Jackson's counsel's undisputed representations to the court that counsel had agreed to extend discovery, that Takara identified McElwrath multiple times during Takara's

8

deposition, and that Takara went to McElwrath's home on the day the parties inspected Jackson's property.

The court of appeals disregarded counsel's uncontested representations and found error in the trial court's reliance on them because Jackson did not present evidence to support them. 640 S.W.3d at 305. But nothing in the text of Rule 193.6 requires the trial court's finding to be supported by specific *evidence* in the record when it is otherwise substantiated by counsel's uncontested representations to the trial court as to the state of discovery in the case. And even if it did, counsel's statements made in open court without any objections satisfy that requirement if the trial court credits them, as it did here. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (noting that, while an attorney's statements are not evidence unless made under oath, the oath requirement is waived if the opponent fails to object when she "knows or should know that an objection is necessary"). In considering whether the trial court abused its discretion, the court of appeals should have considered counsel's statements, along with Takara's trial testimony that she "talked to [McElwrath] multiple times throughout all of this." It erred in failing to do so. Had it considered both Takara's testimony and counsel's uncontested statements as the kinds of record support that may satisfy Rule 193.6(a), it would have concluded that the trial court did not abuse its discretion by allowing McElwrath to testify.

The court of appeals also erred by concluding that the admission of McElwrath's testimony was harmful error. A court of appeals cannot reverse a trial court's judgment based on the erroneous admission of evidence unless the error "probably caused the rendition of an improper

9

judgment." TEX. R. APP. P. 44.1(a)(1); *see Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 148 (Tex. 2004) (concluding the erroneous admission of evidence on other automobile incidents probably resulted in an improper judgment and thus was reversible error because it was "far more than cumulative," was "emphasized at every opportunity," and was central to the liability case). The complaining party must "demonstrate that the judgment turns on the particular evidence admitted." *Nissan Motor Co.*, 145 S.W.3d at 144. By contrast, the erroneous admission of cumulative evidence or evidence that does not control a material and dispositive issue is generally harmless and thus does not require reversal of the trial court's judgment. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). In evaluating whether erroneously admitted evidence is harmless, we review the entire record, considering, in particular, the "state of the evidence, the strength and weakness of the case, and the verdict." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008) (quoting *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 841 (Tex. 1979)); *see also Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018).

Considering the entire record, we cannot agree with the court of appeals' conclusion that the admission of McElwrath's testimony, even if erroneous, would constitute harmful, reversible error. We find no merit in the court of appeals' suggestion that McElwrath's testimony had outsized importance because she was the only disinterested witness who interacted with Hitchcock frequently enough to credibly testify about the extent of his intellectual and physical deficiencies. While the extent of Hitchcock's capabilities may have been thematically important

10

context the jury considered, there was no suggestion that his deficiencies gave rise to a *legal* incapacity impacting the applicable legal standards. *Cf. Yarborough v. Berner*, 467 S.W.2d 188, 190 (Tex. 1971) (holding the trial court properly refused to submit to the jury the issue of whether a child under the age of five was negligent because such a child "was incapable of negligence as a matter of law"). For this reason, the conflicting testimony regarding the degree of Hitchcock's physical and intellectual deficiencies—with Takara and the psychologist emphasizing Hitchcock's deficiencies and Jackson and McElwrath emphasizing his capabilities—was not the case-turning issue Takara and the court of appeals made it out to be. Instead, the central disputed issue was whether any negligent conduct of Jackson, Hitchcock, or both was a proximate cause of Hitchcock's fall. McElwrath, who was not an eyewitness to the incident, had little to offer on this score. Regardless of which side the jury ultimately believed about the level of Hitchcock's abilities, it seemingly—and rationally—found that no negligence on Jackson's part, if any, proximately caused Hitchcock's fall and resulting injuries. That conclusion is consistent with the uncontroverted documentary evidence of Hitchcock's own assessment in the emergency room—elicited on cross-examination and repeated in closing—of the central issue in the case: the cause of his fall was his loss of balance. Accordingly, the other disagreement between the majority and dissent below—whether McElwrath's testimony was "cumulative"—is ultimately immaterial. There was no basis for a new trial either way.

Finally, the court of appeals' harm analysis wrongly ascribed importance to the fact that McElwrath testified last. *See* 640 S.W.3d at

11

306 ("McElwrath was the last witness to testify at trial and we presume her placement at the end was strategic rather than accidental."). McElwrath was Jackson's last witness because she was Jackson's *only* witness. The placement of her testimony at the end of the two-day trial, dictated by court procedure, simply cannot lend support to the court of appeals' conclusion that her testimony was harmful.

We conclude the court of appeals erred in holding that the trial court abused its discretion by allowing McElwrath to testify and in concluding that the admission of her testimony probably caused the rendition of an improper judgment. Without hearing oral argument, *see* TEX. R. APP. P. 59.1, we grant the petition for review, reverse the court of appeals' judgment, and render judgment for Jackson.

**OPINION DELIVERED:** September 1, 2023