IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 01-0030

════════════

 

Nissan Motor Company Ltd.
a/k/a Nissan Motor Company & Nissan Motor Corporation in U.S.A.,
Petitioners

 

v.

 

Marian Armstrong, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Fourteenth District
of Texas

════════════════════════════════════════════════════

 

 

Argued
March 3, 2004

 

 

Justice Brister delivered
the opinion of the Court, in which Chief
Justice Phillips, Justice Hecht, Justice Owen, Justice Jefferson, Justice
Smith, and Justice Wainwright
joined.

 

Justice O=Neill filed a concurring opinion.

 

Justice Schneider did
not participate in the decision.

 

 

In this products liability case, the trial court
erroneously admitted hundreds of reports of alleged accidents, almost all of
which were hearsay and almost none of which were shown to involve defects like
those alleged here.  As the plaintiff=s evidence and arguments at trial
focused on the quantity of other accidents rather than the quality of the
evidence regarding her own, we discount her new position on appeal that the
improper admission of evidence of other accidents was unimportant.  Accordingly, we reverse the judgment of the
court of appeals,[1]
and remand for a new trial.

I

Marian Armstrong=s
parents bought a 1986 Nissan 300ZX in January 1986, and transferred[2] it to
her five or six years later with more than 90,000 miles on the odometer.  On a rainy day in October 1992, immediately
after resigning from her job, Armstrong got into her car and shifted into
reverse.  After she Abarely touched@
the accelerator, the car Atook
off@ backwards and hit a brick building,
though she was pressing the brake pedal as hard as she could.  When she shifted into drive and again Abarely touched@
the accelerator, the car Ashot
forward@ and
struck a telephone pole, again despite application of the brakes.  These collisions resulted in two broken bones
in her foot and nerve damage, injuries the jury assessed at $900,000.  

The Armstrongs had the
car repaired, and about six months later another unintended acceleration
occurred when a family friend was driving the car.  A service writer at a shop specializing in ZX
cars told Armstrong=s father B over the telephone and without seeing
the car B that the
throttle cable might have been jammed by either a small rubber Aboot@
designed to keep dust out of the accelerator mechanism, or a white liner around
the throttle cable.  Armstrong=s father cut off both and discarded
them.

Two years before the Armstrongs
bought their car, the National Highway Traffic Safety Administration (NHTSA)
received a number of complaints of unintended acceleration of 280ZX and 300ZX
cars.  NHTSA opened an investigation, as
it has done with similar complaints involving many other vehicles.  Over the next four years, the agency and two
outside inspection firms conducted inspections and testing, looking at
potential causes that included the fuel injection system, accelerator pedal,
throttle linkages, computerized control system, cruise control, brakes, engine
mounts, automatic transmission, and floor mats. 


In its Closing Report, NHTSA made the following
findings:

 

[T]est and vehicle inspection results showed that the tested
and inspected vehicles did not exhibit any condition that would cause the
vehicle to accelerate at a high rate on its own, and the tested vehicles with
the wide open throttle condition can be controlled by applying the brakes.

 

*        *        *

 

Available
information indicates that inadvertent and unknowing driver application of the
accelerator pedal when the driver intended to apply the brake appears to be the
cause of many of the reported SA [sudden acceleration] related accidents under
several ODI [Office of Defects Investigation] incident investigations, even
though many of the drivers continue to believe that they had been pushing on
the brake pedal.

 

*        *        *

 

During
the course of this investigation, no safety-related defect has been
detected.  Further commitment of resources
to determine whether such a trend may exist does not appear to be warranted.

 

Investigations conducted by other agencies in the
United States and Canada reached the same conclusions, as did Nissan in its own
investigation.  Armstrong contends these
conclusions were incorrect because Nissan never reported to any agency that the
boot or throttle cable was the problem.  

In response to the finding of driver pedal-error,
Nissan recalled 1979-1987 models to install a shift-interlock system that
required drivers to step on the brake before shifting out of park.[3]  Armstrong=s
car had such an interlock.  After the
recall, claims of unintended acceleration dropped dramatically.

Nissan made one more design change.  In 1995 Nissan redesigned the throttle cable
and incorporated a smaller boot on ZX cars, at a cost of $10.66 per unit.  Nissan contends the change was made to
standardize parts among its vehicles, but Armstrong argues the real reason was
to eliminate the defects in the design. 

Armstrong sued Nissan Motor Co. Ltd. and Nissan
North America, Inc. for products liability, negligence, gross negligence,
breach of warranty, fraud, negligent misrepresentations, and violations of the
Texas Deceptive Trade PracticesCConsumer
Protection Act.[4]  In support of her claim that the throttle
cable was defective, Armstrong presented expert testimony from a mechanical
engineer, factual testimony from four other owners who had experienced
unintended acceleration in 300ZX cars, 16 written reports of unintended
acceleration, and Nissan=s
database of 757 consumer complaints. 
Nissan objected unsuccessfully to most of this evidence on grounds of
hearsay, relevance, and incompetence.

The jury returned a verdict favorable to Armstrong
on each of her fifteen theories of liability. 
The trial court rendered judgment on the jury=s
findings of design, manufacturing, and marketing defects, negligence, and gross
negligence, but rendered judgment notwithstanding the verdict on the other
theories.  Although Armstrong and Nissan
had stipulated to $2 million in punitive damages if the jury found gross
negligence (which it did), the trial court remitted this amount to $1.2
million. 

Both sides appealed.  When the court of appeals affirmed, both
sides petitioned this Court for review.

II

A

This is not the first lawsuit in Texas alleging
that a vehicle accelerated on its own. 
This Court and others have considered several such cases involving
different vehicles, different asserted defects, and different alternative
causes.

In Gammill v.
Jack Williams Chevrolet, Inc., we affirmed summary judgment for the
manufacturer of a 1988 Isuzu Trooper in a suit alleging that the accelerator
pedal became entangled with wiring below the dashboard.[5]  The Gammills
pointed to a scrape on the wiring sheath as evidence of entanglement and expert
testimony that a different design could have avoided the defect.[6]  But while their expert on unintended
acceleration was a licensed mechanical engineer with substantial experience
working on cars, he had never designed them.[7]  Accordingly, we held the trial court did not
abuse its discretion in finding him unqualified to testify about design
defects; as this was the only testimony supporting the plaintiffs= claims relating to the car=s accelerator system, we affirmed the
trial court=s summary
judgment finding no defect.[8] 

In General Motors Corp. v. Hopkins, we
affirmed a judgment against the manufacturer of a 1970 Chevrolet pick‑up
based on allegations that a lock‑out pin jammed a carburetor in the open
position, causing an influx of fuel and unintended acceleration.[9]  We held the verdict was supported by evidence
that (1) after the accident, the lock‑out pin was found in the jammed
position, (2) a similar malfunction had occurred with the same vehicle earlier,
and (3) GM files contained a picture and correspondence among GM engineers
addressing the problem.[10]

But in Henderson v. Ford Motor Co., we
reversed a judgment against the manufacturer of a 1968 Lincoln Continental
based on allegations that a piece of rubber from a gasket jammed the carburetor=s throttle blades.[11]  Though the carburetor was found in that
condition some years later, no expert testified it had been caused by an
unreasonably dangerous design or that an alternative would have prevented it.[12]

In all of these cases, it was not enough that a
vehicle accelerated when claimants swore they had done nothing.  Instead, we have consistently required
competent expert testimony and objective proof that a defect caused the
acceleration.  The courts of appeals have
done the same, holding liability cannot be based on unintended acceleration
alone,[13] on lay
testimony regarding its cause,[14] or on
defects not confirmed by actual inspection.[15]  Courts elsewhere do too.[16] 

These requirements are not peculiar to unintended
acceleration cases.  We recently held in Ford
Motor Co. v. Ridgway that an engine fire in an
older vehicle was not evidence that the vehicle was defective; there were
simply too many potential causes to assume from the one that the other must
have been the culprit.[17]  Instead, we held that a specific defect must
be identified by competent evidence and other possible causes must be ruled
out.[18]

These requirements are especially compelling in
unintended acceleration cases.  Not only
are there many potential causes (from floor mats to cruise control), but one of
the most frequent causes (inadvertently stepping on the wrong pedal) is
untraceable and unknown to the person who did it.[19]

Accordingly, we again affirm that the mere
occurrence of an unintended acceleration incident is no evidence that a vehicle
is defective.  While it was up to the
jury in this case to decide what caused Armstrong=s
accident, she had to present evidence that her ZX car was defective, not just
that other owners experienced unintended acceleration.

B

Nor is this the first time Texas courts have
considered the admissibility of evidence of similar accidents.

We addressed this question some years ago in two
cases involving evidence of other accidents offered to show a railroad crossing
was extra-hazardous (thus requiring additional warnings).[20]  In one case, we held it was reversible error
to admit evidence of two previous accidents occurring during the daytime
in a case involving an accident occurring on a foggy night.[21]  But in another, we held it was reversible
error to exclude evidence of six previous nighttime accidents in a case
involving the same conditions,[22] as in
all of them the motorists' headlights could not illuminate the depression where
the crossing was located until it was too late.[23]

Just as proof of other accidents may show a
crossing is extra-hazardous, proof of other accidents may be introduced to show
a product is unreasonably dangerous.[24]  But several restrictions apply.

First, as in the train-crossing cases, the other
incidents must have occurred under reasonably similar (though not necessarily
identical) conditions.[25]  The degree of similarity required depends on
the issue the evidence is offered to prove.[26]

Second, evidence of similar incidents is
inadmissible if it creates undue prejudice, confusion, or delay.[27]  Proof of what happened in a previous accident
does not, without more, prove what happened in a current one.[28]  Further, prolonged proof of what happened in
other accidents cannot be used to distract a jury=s
attention from what happened in the case at hand.  

Third, the relevance of other accidents depends
upon the purpose for offering them. 
Other accidents are admissible for some purposes and not for
others.  For example, other accidents may
be relevant to show whether:

 

$          a product was unreasonably dangerous;[29] 

 

$          a warning should have been given;[30]

 

$          a safer design was available;[31] or

 

$          a manufacturer was consciously
indifferent toward accidents in a claim for exemplary damages.[32]

 

Conversely, a defendant may want to introduce evidence of other
accidents as part of a state-of-the-art defense,[33] or the absence
of other accidents to rebut claims that a product was dangerous.

Several of these uses place logical limits on what
accidents are relevant, such as when the accidents occurred.  Whether a product was defective must be
judged against the technological context existing at the time of its
manufacture.[34]  Product design and product warnings can take
into account accidents occurring before production and sale, but not
unforeseeable accidents occurring thereafter.[35]  Nor can exemplary damages be assessed based
on hindsight; deciding whether a defendant ignored an extreme risk Arequires an examination of the events
and circumstances from the viewpoint of the defendant at the time the events
occurred, without viewing the matter in hindsight.@[36]

Of course, post-sale events may sometimes be quite
relevant and thus admissible.  For
example, Nissan=s
evidence showing the dramatic drop in ZX acceleration incidents after
shift-interlock systems were installed B
even though occurring long after the sale to the Armstrongs
B certainly seems probative of what
might have been causing them all along.

We do not attempt here to categorize every
instance when other accidents are admissible or every occasion when they are
not.  But in exercising discretion
regarding admissibility, trial courts must carefully consider the bounds of
similarity, prejudice, confusion, and sequence before admitting evidence of
other accidents involving a product.

C

Several Texas courts have also considered the
admissibility of third-party complaints that an accident occurred.

Complaint letters in a manufacturer=s files may be true, but they also may
be accusatory and self‑serving; they are rarely under oath and never
subject to cross-examination.[37]  As they are necessarily out-of-court
statements, they are hearsay if offered to prove the truth of the assertions
therein B that the
incidents complained of occurred as reported.[38]  While a compilation of such complaints by a
manufacturer might constitute a business record that such claims were (or were
not[39])
received, they could not be a business record that such claims are true unless
the employee making the record had personal knowledge of each.[40]  Thus, consumer complaints in a company=s files are generally hearsay within
hearsay, and require their own exception in addition to that for business
records generally.[41]  

Of course, accident complaints may be admissible
if offered to prove something other than truth. 
In Uniroyal Goodrich Tire Co. v.
Martinez, we held that evidence of 34 previous lawsuits in which claimants
admitted mounting a 16-inch tire on a 16.5-inch rim was admissible to show that
a manufacturer knew users were not heeding its warnings.[42]  Though the manufacturer in that case denied
the validity of those claims, it acknowledged that they resulted from
mismatched tires and rims;[43] as the
truth of that part of each claim was admitted, they were not admitted for that
purpose.

However, a few courts of appeals (including the
one involved here) have gone much further, concluding that mere claims of
similar accidents are generally admissible because A[t]he
fact that causation in the other complaints has not been proven with absolute
certainty goes to their weight, not their admissibility.@[44]  But a hearsay objection goes to admissibility,
not weight; oaths and cross-examination are required not to make evidence
absolutely certain, but to make it admissible in the first place.

Again, we do not attempt here to categorize every
instance when consumer complaints may or may not be admissible.  But we have never held that mere claims of
previous accidents can prove a product is defective, and we decline to do so
here.  A number of complaints may require
a prudent manufacturer to investigate, and may presage liability if those
complaints are substantiated and the manufacturer does nothing.  But a large number of complaints cannot alone
raise a fact question that a defect exists.

III

Nissan argues that most of Armstrong=s evidence admitted at trial violated
these standards.  We agree.

A

The trial court admitted Nissan=s database of 757 complaints it had
received of unintended acceleration in ZX cars. 
Nissan unsuccessfully objected to the database on relevance and hearsay
grounds.  

The database was made up entirely of hearsay
reports received by Nissan.  Some reports
attributed unintended acceleration to a particular cause, and others did not;
but none pointed to the throttle cable. 
More than 200 of the complaints involved cars that did not even have the
allegedly defective throttle mechanism. 

The court of appeals cited four reasons for
admitting the database.  First, the court
held these accidents occurred under reasonably similar circumstances.[45]  As noted above, unintended acceleration can
have many causes, and we have always required competent evidence of a specific
defect.  There is nothing in the database
to suggest that the defect, if any, causing those 757 incidents was similar to
any of the defects alleged here.  This is
not similar enough.

Second, the court concluded that Athe sheer number and nature of reported
incidents raise an inference that the unintended acceleration or stuck throttle
was caused by something other than driver error.@[46]  In other words, because many people claimed
their cars took off on their own, it is less likely that any of them were
mistaken.  This, of course, is not
true.  The sheer number of auto accidents
in America raises no inference that most have nothing to do with drivers= mistakes.  Moreover, it is using hearsay for the truth
asserted B the more
hearsay there is, then the more likely it must be right.

Third, the court held that Nissan waived any
objection to admission of other accidents,[47] despite
its specific objection to the database as hearsay and irrelevant.  Armstrong asserts waiver occurred when Nissan
Aopened the door@
to evidence of consumer complaints by offering the reports by NHTSA and others
that mentioned them as well.

But the reporter=s
record does not reflect that Nissan offered these exhibits before Armstrong
offered and used the database.  While
Armstrong assures us the exhibit was offered and admitted pretrial, there is no
written or oral order in the record to that effect.[48]  Once the trial court admitted Armstrong=s evidence of other accidents, Nissan
could offer similar evidence in rebuttal without waiver.[49]  Without proof that Nissan=s exhibit was admitted first, Nissan
waived nothing by its subsequent reply. 

But more important, the two kinds of proof here
were not the same.  Data, findings, and
reports from government agencies are generally not hearsay;[50]
out-of-court complaints from unknown third-parties generally are.  The NHTSA report listed the numbers of
reported acceleration incidents as background to indicate what and why it was
investigating; Armstrong offered the database to show that ZX cars were
defective.  Even if the NHTSA report was
admitted first, it did not hold the door open for the database.

Fourth and finally, the court of appeals indicated
that the database was relevant to show ANissan=s knowledge of the dangerous condition
in its vehicles.@[51]  In other words, the hearsay was admissible
not for the truth of the matters asserted, but to show Nissan=s knowledge of the truth of the
matters asserted.  The hearsay rules
cannot be avoided by this kind of circular reasoning.

To sum up, product defects must be proved; they
cannot simply be inferred from a large number of complaints.  If the rule were otherwise, product claims
would become a self-fulfilling prophecy C
the more that are made, the more likely all must be true.  Without proof that a hearsay exception
applied or that any of the reported incidents were due to a defect similar to
those alleged by Armstrong, the trial court erred in admitting the database of
complaints.

B

The trial court also admitted approximately
sixteen[52] reports
of incidents of unintended acceleration, three from NHTSA=s files and the remainder apparently
from Nissan=s.  

Nissan objected to the reports from NHTSA=s files on grounds of hearsay.  Even though these were collected by a
government agency, like the database they contained hearsay within
hearsay.  Though Armstrong claims they
were admissible to show Anotice,@ all were reported to NHTSA eight to
ten years after the Armstrongs bought their car, and
as she claims not to assert any post-sale duty or duty to recall, it is unclear
how the notice so much later would have made any difference to her.

Unlike the database, Nissan objected to eight of
the remaining reports on relevance grounds only; there was no hearsay
objection, perhaps because some of them include observations by personnel at
Nissan dealerships.  As four of these
reports contain no mention of a defect relating to the throttle cable, the
objection should have been sustained.  As
with the database, reports of unintended acceleration due to an unknown or some
other cause would be irrelevant to Armstrong=s
case.

Eight of the reports (including those in NHTSA=s files) point to a defective throttle
cable or boot as the cause.[53]  Of the eight that might involve similar
defects, only two appear to involve rapid acceleration (similar to Armstrong=s claim) rather than a stuck throttle
that simply would not decelerate; the latter would be relevant only if
Armstrong pressed the accelerator more than she admitted.

Nevertheless, we agree with Armstrong that on the
record before us the trial court did not abuse its discretion in admitting the
eight reports of allegedly similar defects. 
Nissan presented evidence that the possibility that a deteriorated boot
might jam the throttle cable was about as likely as Abeing
struck by lightning@; this
claim was made not regarding what Nissan knew in 1986, but as a fact regarding
all ZX cars sold before or after. 
Evidence in some of the narrative reports suggested that it could and
did occur, and thus they were admissible to rebut Nissan=s
claim.[54]  

Of course, this requires assuming the truth of the
matters asserted in those reports.  But
Nissan only objected to two on hearsay grounds, making no objection at all to
two others.  Although Nissan filed a
request for a limiting instruction, no ruling appears in our record, so the
remaining four were properly admitted for all purposes.[55] 

In sum, Nissan failed to object to six of the
narrative reports; four others were properly admissible under the facts of this
case.  We hold the trial court erred in
admitting the remainder.

C

Armstrong also offered, over Nissan=s objection, the testimony of four
witnesses who said they had experienced unintended acceleration events in 300ZX
cars.  

The first, Paul Roupinian,
claimed that in 1987 he was backing his 300ZX when the car accelerated for no
reason and would not stop.  When Roupinian sued Nissan but could produce no evidence that
his incident was caused by anything Nissan did, the court found his suit
frivolous and sanctioned him $125,000.  

The second, Linda Faust, testified she had an
acceleration incident in May 1987.  She
said she shifted into neutral, the car made an Aincredible
noise,@ and she
pumped the brake before finding that ineffective.  She sued Nissan, but her expert and mechanics
found nothing wrong with the car, and her suit was also dismissed. 

The third, Martha Ham, said that she put a 300ZX
into drive and it Atook off@ until she hit a ditch.  She testified that she Astood@
on the brake pedal with both feet, but the car accelerated anyway.  She did not know the cause of her incident,
and the Texas Motor Vehicle Commission denied her complaint that her car was
defective.[56]


The fourth witness, Gary Lysdale,
was the only one to mention the throttle cable, testifying that the boot on his
100,000-mile car was loose but not jamming the throttle.  However, as his problems continued after
installation of the redesigned cable (which Armstrong alleged would have
eliminated the defect causing her accident), it could not have been caused by
the same defect.

None of the four lay witnesses could verify a
defect as the cause of their acceleration incidents, much less a defect similar
to that alleged by Armstrong.  Other than
having accidents they described as unintended acceleration, these owners could
show no similarity between their experiences and those involved in Armstrong=s suit. 
As with documentary evidence, testimonial evidence of unintended
acceleration is no evidence of a defect. 
Thus, the trial court erred in allowing these witnesses to testify.

D

Finally, Nissan objects that Armstrong=s expert witness was not qualified to testify.  The court of appeals rejected Nissan=s objection on the basis that the
defect alleged here Adid
not require an explanation from a >rocket
scientist,=@[57]
apparently overlooking that the expert we rejected in Gammill
arguably was a rocket scientist.[58]  But as Nissan=s
pretrial motion to exclude the expert=s
testimony asserted not that he was unqualified but that his opinions were
unreliable, we hold this complaint was not preserved for appeal.[59]

IV

Having found the trial court erred in admitting
the database, the testimony of four witnesses, and several narrative reports
regarding other incidents of unintended acceleration, we must consider whether
these errors require reversal.  Erroneous
admission of evidence requires reversal only if the error probably (though not
necessarily) resulted in an improper judgment.[60]  We review the entire record, and require the
complaining party to demonstrate that the judgment turns on the particular
evidence admitted.[61]

Clearly, erroneous admission is harmless if it is
merely cumulative.[62]  But beyond that, whether erroneous admission
is harmful is more a matter of judgment than precise measurement.  In making that judgment, we have sometimes
looked to the efforts made by counsel to emphasize the erroneous evidence[63] and
whether there was contrary evidence that the improperly admitted evidence was
calculated to overcome.[64]

In this case, Armstrong=s
trial attorneys clearly believed her case turned on the evidence of other
incidents.  At every opportunity, they
emphasized the large number of general complaints of unintended acceleration
rather than the small number of those involving a similar defect.  For example, her trial counsel began voir dire by stating:

 

This case involves a defective car that injured Marian
Armstrong, our client.  Marian=s tragedy was not an isolated incident.
 She was one of many whose lives have
been tragically affected by Nissan=s
300 ZX car.

 

He continued throughout voir dire
in the same vein:

 

There=s
a bunch of Nissan dealers here in Houston. 
Nissan got a bunch of complaints about these 300ZX with sudden
acceleration, you expect Nissan to tell the dealers that this is a
problem.  Can we all agree with that? 

 

*        *       
*

 

If Nissan admits there is a defect in their car, with lots of
complaints, accidents, and even deaths, what happens to the company? . . .  They are responsible.

 

Co-counsel for Armstrong promised
the following in his opening statement:

 

We are going to bring you a lot of incidents involving the
ZX.  Bring you the government report on
it. . . .  We are going to bring you
evidence about what Nissan did to try and fix these cars.

Similarly, Armstrong=s
sole expert witness supported his opinions by again relying on many incidents of
similar acceleration without proof that they involved similar defects:

 

Q:        [By plaintiff=s
counsel] Do you have an opinion, sir, whether or not there was a design defect
in Marian Armstrong=s 1986
3300ZX that was a cause of her accident on October 30, 1992?

 

A:        Yes, I do.

 

Q:        What is your
opinion?

 

A:        My opinion is that the defect presence [sic] was well known
to Nissan.  The have enumerable [sic]
reports that this very thing was happening.

 

*        *       
*

 

Q:        [By plaintiff=s
counsel] Do you have an opinion as to whether or not any of those acts would
have been a cause of Marian Armstrong=s
occurrence on October 30, 1992?

 

A:        Yes, I do.

 

Q:        What is your
opinion?

 

A:        My opinion is that first Nissan B
I have seen many documents from Nissan to show that they were aware of this
hazard.  I have also seen documents where
[sic] Nissan submitted to NHTSA where they denied any problem.  They hides [sic] behind the excuse, driver
error.  Must have pushed the gas.  We found no fault with this vehicle.  They would say that even at the same time
their records are full of people saying my cable got stuck.  That=s
deceitful in the very ultimate sense.

 

*        *        *

 

Q:        [By defense counsel] I think you told this jury yesterday
that in your opinion Nissan was negligent when they didn=t fix the problem of unintended
acceleration after the first report they received?

 

A:        I did not say that. 
What I did say was that they had many reports of sudden acceleration and
they were derelict in not responding to that situation.

 

*        *        *

 

Q:        [By defense counsel] Your whole opinion about whether Nissan
should have warned with respect to the throttle cable, assumes that the
throttle cable is defective, right?

 

A:        I would rather say that it is based upon the repeated reports
by Nissan personnel that the cables had frayed. 
They were told this by so many people, they should have realized there
is a problem here and responded to it.  I
do not view that as an assumption, but more a reaction to the material I=ve looked at.

 

Q:        Maybe I am confused.  I
thought you just told us a second ago that you hadn=t seen a single document where anybody
had suggested that the cable was frayed.

 

A:        They said it was stuck and failed.  They did not use the words frayed.  And I answered your specific question.  We have those documents and many more that
show that Nissan personnel, customers, a whole wide range of people had
informed Nissan that the cable failure was causing their car to accelerate
inappropriately.

 

Armstrong=s
closing argument began similarly:

 

What is the essence, the real essence of this case?  It=s
about a machine that fails without warning. 
It=s about a
company that knows that but will not admit that.

 

*        *        *

 

It=s
a company in essence that will say to you, what is happening with these cables
. . . it happens on the same level as getting struck by lightning . . . .  Gary Larson was struck by lightning in >88, >89,
>89, >89,
several times throughout the year; >94
again Gary Lysdale was struck by lightning.  Martha Ham was struck by lightning. Paul Roupinian was struck by lightning and now faces 125
thousand dollar judgment over his head, a 29 year old man.  All these families are struck by lightning.

 

Nissan=s
counsel complained about this emphasis, beginning his closing argument with the
following observation:

 

I have noticed a trend in this case from the beginning to now
at the very end.  The majority of the
plaintiff=s case
has focused on things other than her accident, other than the facts of her
accident.  Now why would that be?  Why would they focus on other incidents,
other accidents and not hers?  What is
this case about, folks?

 

In rebuttal, Armstrong=s
trial counsel replied:

 

[Defense counsel] said, you know, I only saw two incidents of
throttle cable problems.  You know, I
have a problem with that because I keep seeing these reports . . . .  Those are just some of the reports.  You can look in here and see how many more
there are.  There are lots of them.

 

Finally, Armstrong=s
counsel closed his argument with the following:

Remember Linda Faust and these [other] people [who] came
here.  Nobody is paid.  Everybody is here because they have had a
problem and they=re angry
that they are called idiots and stupid for putting their foot on the gas or
having the mat tie up in their cars.

 

As Armstrong=s trial attorneys spent much of the
trial trying to persuade the judge and jury that other incidents of unintended
acceleration were of great significance, we reject her new argument on appeal
that they were not.

Though we reach a different conclusion
from the court of appeals on admissibility, we agree with its assessment of the
crucial nature of this evidence:

 

We agree with Nissan=s
argument that the admission of such a high volume of other unintended
acceleration incidents was prejudicial to its claims asserted at trial.  However, we disagree with Nissan=s arguments that the trial court abused
its discretion in deciding to admit the evidence.[65]

 

Three times in its opinion, the court of appeals
relied on the quantity of other accidents rather than their quality to find the
jury=s verdict
factually and legally sufficient:

 

The jury could reasonably have concluded from this Amountain@
of related incidents that it was more probable than not the unintended
acceleration had been caused by some mechanical malfunction, not by some error
on the part of the driver.[66]

 

*        *        *

 

Although
most of the incident reports did not attribute a technical cause for the
unintended acceleration, the sheer number and nature of reported incidents raise
an inference that the unintended acceleration or stuck throttle was caused by
something other than driver error.[67] 

 

*        *        *

 

In sum, the evidence showed that Nissan had within its
possession and knowledge numerous documented reports of incidents of unintended
acceleration and stuck throttles caused by throttle cable boot failure and that
Nissan never advised NHTSA or its own customers about these potential safety
issues. . . .  Based on this evidence,
the jury could reasonably have concluded that Nissan, despite knowledge of a
defect, had failed to take any action or sufficient action to correct the
problem or to warn its customers or the public about the danger.[68]

 

The court=s
reliance on the Ahigh
volume,@ Amountain,@
Asheer number,@
and Anumerous@ reports of other incidents fails to
acknowledge that at most a handful of them related specifically to the throttle
cable defects Armstrong alleged.  As the
experienced justices of the court of appeals made this mistake, it is probable
that the jurors did as well.

Armstrong argues that because
eight reports of throttle cable boot problems were properly admitted, the
remainder were cumulative and thus harmless. 
But there is a difference in the context of this case between cumulative
and overwhelming; a jury trying to decide whether ZX cars were unreasonably
dangerous might need to know whether the true number of similar problems was
closer to eight or eight hundred.  And as
shown above, Armstrong=s
attorneys did not treat the large number of hearsay complaints as merely
cumulative; it was the thrust of her case.

Finally, this case was not like Hopkins
or Henderson, as no one ever observed either the boot or liner
actually jamming the throttle cable. 
Armstrong=s father
did not, and he was the only one who saw them. 
While he testified both were worn and loose, he cut both off and threw
them away before anyone else saw them, taking the photographs admitted at trial
only after he had done so.  A service
writer for an auto repair shop said he frequently saw loose throttle cable
boots, but did not testify he had ever seen one actually jam a throttle cable,
and rendered no expert opinions as the trial court found he was unqualified to
do so.[69]  

Armstrong=s
expert only testified that the cause of her accident could have been a
cruise control defect, the throttle cable boot, or the liner, but that he had Ano way of knowing which.@ 
Because the alleged boot and liner defects could hold a throttle open
but not open it wider, he did not try to explain how Armstrong=s car could have accelerated wildly
when she Abarely
touched@ the
accelerator; he simply assumed she did otherwise.

Of course, there was other
evidence to support Armstrong=s
claim.  As noted, there was some evidence
that the boot could jam a ZX cable, and that Nissan may have known that before
1986.  Further, the redesigned cable and
boot presented some evidence of a feasible alternative.  Armstrong=s
expert testified that, though he was not a doctor, he did not believe she could
have broken her foot where she did if her foot was on the accelerator rather
than the brake (as she said it was).

The question before us is not
whether the jury=s verdict
was right or wrong; we only must decide whether the erroneously admitted
evidence probably made the judgment improper.[70]  In this case, the evidence of other incidents
was far more than cumulative: it was emphasized at every opportunity; it was
used to prove a defect when the actual evidence had been destroyed; and it was
calculated to show Nissan was malicious rather than mistaken in suggesting the
accident was Armstrong=s
fault.  

It also violated the
long-standing rule in Texas that proof of unintended acceleration is not proof
of a defect.  Under that rule, proof of many
instances of unintended acceleration cannot prove a defect either;[71] a lot
of no evidence is still no evidence.  

For all these reasons, we hold that
the evidence improperly admitted in this case probably resulted in an improper
judgment.  Accordingly, we reverse and
remand for a new trial without it.[72]

V

As we must remand for a new
trial, we address the remaining arguments only briefly.  

First, Nissan asserts there was
no evidence to support the trial court=s
award of exemplary damages, pointing out that the court of appeals relied
heavily on matters Nissan learned only after the vehicle here was designed,
manufactured, and sold.[73]  In Transportation Ins. Co. v. Moriel, we prohibited post-hoc gross negligence,
holding that whether a defendant=s
acts or omissions involved an extreme risk Arequires
an examination of the events and circumstances from the viewpoint of the
defendant at the time the events occurred, without viewing the matter in
hindsight.@[74]  But as there was also testimony that could be
construed to indicate Nissan knew of acceleration claims relating to the boot
from 1984, we remand the exemplary damage claim with the remainder of the case.

Next, Nissan argues that
Armstrong=s claims
assert a failure to take post-sale remedial measures, and thus conflict with
our decision in American Tobacco Co. v. Grinnell.[75]  But Armstrong denies she is making such a
claim, and the court of appeals never purported to create such a duty.[76]  Nissan=s
complaint under this point instead appears to be that the trial court admitted
reports of post-sale incidents, complaints we have addressed in part III above.

Third, Nissan argues that the
trial court erred in charging the jury that Nissan was negligent per se in
failing to notify the United States Government and Armstrong Awhen it learn[ed] the vehicle . . .
contain[ed] a defect and decid[ed] in good faith that
the defect [was] related to motor vehicle safety.@[77]  Nissan did notify the government of the
complaints of unintended acceleration in ZX cars, and the subsequent
investigation was not concluded until three years after the Armstrongs
bought their car.  Even assuming Nissan=s notification was incomplete and that
a violation of the statute could be asserted in an individual citizen=s negligence case, there is no evidence
that any report to the government would have resulted in a change in ZX cars
before the Armstrongs bought theirs.  Thus, no violation of the statute caused
their injury.[78]


In her appeal, Armstrong argues
that the trial court erred in remitting part of the exemplary damages.  Because we have concluded inadmissible
evidence tainted the former trial and requires a new one, this point is
moot.  

Armstrong also argues the trial
court erred in rendering judgment notwithstanding the verdict on her claims
asserting fraud, negligent misrepresentation, breach of warranty, and violation
of the DTPA.  Armstrong obtained her car
from her parents six years after they bought it from Nissan; Nissan had no
involvement or pecuniary interest in the transaction.[79]  There was no evidence of any specific
warranty or representation Nissan ever made to her, and no duty to disclose
either.[80]  The trial court did not err in dismissing
these claims.

Accordingly, we reverse the
judgment of the court of appeals, and remand the case for a new trial on
Armstrong=s
remaining claims in accordance with this opinion.

 

 

______________________________________

Scott Brister

Justice

 

 

 

OPINION DELIVERED: 
August 27, 2004











[1] See 32 S.W.3d 701, 710.





[2] It was disputed whether this was a gift or payment
for services she had performed.





[3] Armstrong presented some evidence suggesting the Avoluntary@ recall
was in return for NHTSA=s agreement not to undertake a more formal defect
investigation. 





[4] Tex. Bus.
& Com. Code '' 17.41-.63.





[5] 972 S.W.2d 713, 715 (Tex. 1998).





[6] Id.





[7] Id. at 717, 719.





[8] Id.





[9] 548 S.W.2d 344, 346 (Tex. 1977), overruled on
other grounds by Turner v. Gen. Motors Corp., 584 S.W.2d 844 (Tex. 1979)
and Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex. 1984).





[10] Hopkins, 548 S.W.2d at 347.





[11] 519 S.W.2d 87, 88-89, 94 (Tex. 1974).





[12] Id. at 89, 93.





[13] Hernandez v. Nissan Motor Corp. in U.S.A., 740
S.W.2d 894, 895 (Tex. App.CEl Paso 1987, writ denied) (holding proof of
unintended acceleration insufficient to show product defect).





[14] Selig v. BMW of
N. Am., Inc., 832 S.W.2d 95, 99, 105 (Tex. App.CHouston [14th Dist.] 1992, no writ) (affirming summary
judgment for manufacturer of BMW 325 as plaintiff=s lay
testimony regarding unintended acceleration could not overcome expert testimony
that no defect was found).





[15] Bass v. Gen. Motors Corp., 491 S.W.2d 941,
945, 947 (Tex. Civ. App.CCorpus Christi 1973, writ ref=d n.r.e.) (affirming
directed verdict for manufacturer of 1966 Buick LeSabre
as each of the defects suggested by plaintiff=s
witness had been checked and eliminated).





[16] See, e.g., Gen. Motors Corp. v. Muncy, 367 F.2d 493, 498 (5th Cir. 1966) (applying
Texas law to substantive law claim); Scanlon v. Gen. Motors Corp., 326
A.2d 673, 678 (N.J. 1974); Abel v. Gen. Motors Corp., 507 N.E.2d 1369,
1375-76 (Ill. Ct. App. 1987), disapproved on other grounds by Overcast
v. Bodart, 639 N.E.2d 984 (Ill. Ct. App. 1994); Braun
v. Ford Motor Co., 363 A.2d 562, 568 (Md. Ct. Spec. App. 1976).





[17] 135 S.W.3d 598, 600-01 (Tex. 2004) (holding expert=s opinion that he Asuspected@ electrical system caused vehicle fire after visual
inspection of truck and review of service manuals and NHTSA database
insufficient to raise fact question of defect).





[18] Id. at 601.





[19] Cf. Haddock v. Arnspiger,
793 S.W.2d 948, 950 (Tex. 1990) (holding res ipsa loquitur applies only if
accident ordinarily occurs due to defendant=s negligence
with respect to instrumentality under defendant=s control).





[20] See Mo.‑Kan.‑Tex. R.R. Co. v. May,
600 S.W.2d 755, 756 (Tex. 1980) (per curiam); Mo.
Pac. R.R. Co. v. Cooper, 563 S.W.2d 233, 236 (Tex. 1978).





[21] Cooper, 563 S.W.2d at 236-38.





[22] May, 600 S.W.2d at 756.





[23] May v. Mo.‑Kan.‑Tex. R.R. Co., 583
S.W.2d 694, 698-99 (Tex. Civ. App.CWaco 1979), writ ref=d n.r.e., 600 S.W.2d 755 (Tex. 1980) (per curiam).





[24] Uniroyal Goodrich
Tire Co. v. Martinez, 977 S.W.2d 328, 340-41 (Tex. 1998); see Ferdinand
S. Tinio, Annotation, Products Liability:
Admissibility of Evidence of Other Accidents to Prove Hazardous Nature of
Product, 42 A.L.R.3d 780, 783 (1972) (noting Aevidence
of other accidents involving the same product is generally admissible to show
its dangerous or hazardous nature, if the accidents occurred under the same or
substantially similar conditions as that involving the plaintiff, and with
reasonable proximity in time@).





[25] Uniroyal Goodrich
Tire Co., 977 S.W.2d at 341.





[26] 2 Jack B.
Weinstein & Margaret A. Berger,
Weinstein=s Federal Evidence ' 401.08[2], at 52 (2d ed. 2004).





[27] Tex. R. Evid.
403; N. Am. Van Lines, Inc. v. Emmons, 50 S.W.3d 103, 125 (Tex. App.CBeaumont 2001, pet. denied) (holding evidence of other
accidents inadmissible as it involved one instance of children burning to death
and required defendant to re‑litigate merits of its defense in each of
other cases). 





[28] See Allstate Tex. Lloyds v. Potter, 30 S.W.3d
658, 662 (Tex. App.CTexarkana 2000, no pet.). 





[29] Uniroyal Goodrich
Tire Co., 977 S.W.2d at 340-41.





[30] See Gen. Motors Corp. v. Saenz, 873 S.W.2d
353, 356 (Tex. 1993).





[31] See Hernandez v. Tokai Corp., 2 S.W.3d
251, 258 (Tex. 1999); Boatland of Houston,
Inc. v. Bailey, 609 S.W.2d 743, 746 (Tex. 1980).





[32] See Gen. Chem. Corp. v. De La Lastra,
852 S.W.2d 916, 921-22 (Tex. 1993).





[33] See Boatland,
609 S.W.2d at 748.





[34] Id. at 746.





[35] See Hernandez, 2 S.W.3d at 256-57; see also
Uniroyal Goodrich Tire Co. v. Martinez, 977
S.W.2d 328, 340-41 (Tex. 1998) (holding trial court properly admitted evidence
of lawsuits involving earlier accidents); Restatement
(Third) of Torts: Products Liability ' 2(b)
(1998).





[36] Transp. Ins. Co.
v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994)
(emphasis added).





[37] Minn. Min. & Mfg. Co. v. Nishika
Ltd., 885 S.W.2d 603, 631-32 (Tex. App.CBeaumont
1994), rev=d on other grounds, 953 S.W.2d 733 (Tex. 1997).





[38] Id.; see Tex. R. Evid. 801; O'Connor v. National Motor Club of
Tex., Inc., 385 S.W.2d 558, 560-61 (Tex. Civ.
App.CHouston 1964, no writ).





[39] See Tex.
R. Evid. 803(7).





[40] See Tex.
R. Evid. 803(6).





[41] See Tex.
R. Evid. 805.





[42] 977 S.W.2d 328, 340-41 (Tex. 1998); accord Sears,
Roebuck & Co. v. Kunze, 996 S.W.2d 416,
426-27 (Tex. App.CBeaumont 1999, pet. denied) (affirming admission of
database of injury claims for limited purposes of notice and conscious
indifference).





[43] Uniroyal Goodrich
Tire Co., 977 S.W.2d at 341 n.7 (noting acknowledgment in manufacturer=s interrogatory answers).





[44] 32 S.W.3d 701, 712; see also Hyundai Motor Co. v.
Alvarado, 989 S.W.2d 32, 40 (Tex. App.CSan
Antonio 1998, pet. granted, judgm=t vacated w.r.m.). 





[45] 32 S.W.3d at 712.





[46] Id. at 710.





[47] Id. at 712.





[48] The rules of civil procedure allow pretrial tender of
exhibits, but require any pretrial rulings to be recited in an order.  Tex.
R. Civ. P. 166(l), (m), (p).





[49] Scurlock Oil Co.
v. Smithwick, 724 S.W.2d 1, 4 (Tex. 1986); Cathey v. Mo., K. & T. Ry.
Co., 133 S.W. 417, 419 (Tex. 1911).





[50] Tex. R. Evid.
803(8).





[51] 32 S.W.3d at 712.





[52] Although the reports are marked exhibits 7A through
7N, 7A appears to involve three cars, 7I and 7J appear to be the same incident,
7K appears to be three incidents, and there appears to be no 7C.





[53] An additional report points to the cable as a
possible cause, but it appears to be from Gary Lysdale
(one of the lay witnesses who testified at trial) and relates to a different
defect for reasons discussed in part III(C) below.





[54] See Horizon/CMS Healthcare Corp. v. Auld, 34
S.W.3d 887, 906 (Tex. 2000) (holding survey reports admissible to rebut false
impression that nursing home had not been cited for rendering improper care,
when in fact it had).





[55] See Tex. R.
Evid. 105(a).





[56] See Tex.
Occ. Code ' 2301.204-.206 (giving Motor Vehicle Board power to
hear complaints of vehicle defects).





[57] 32 S.W.3d 701, 708.





[58] Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 717 (Tex. 1998) (noting that
expert designed fighter planes and anti‑radiation missiles).





[59] Tex. R. App.
P. 33.1.





[60] Tex. R. App.
P. 61.1; City of Brownsville v. Alvarado, 897 S.W.2d 750, 753
(Tex. 1995).





[61] Interstate Northborough P=ship v. State,
66 S.W.3d 213, 220 (Tex. 2001); Tex. Dep't of Transp.
v. Able, 35 S.W.3d 608, 617 (Tex. 2000).





[62] GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605,
620 (Tex. 1999) (holding erroneous admission of expert testimony harmless, as
it was cumulative of other proper testimony regarding harassment).





[63] Alvarado v. Farah Mfg.
Co., Inc., 830 S.W.2d 911, 917 (Tex. 1992) (considering extensive efforts
by counsel for each party to offer and exclude retaliation complaint by another
worker in holding erroneous admission was harmful); see also Spohn Hosp. v. Mayer, 104 S.W.3d 878, 883-84 (Tex.
2003) (holding sanction instructing jury to believe one version of contested
fact was harmful, as counsel emphasized it in voir
dire, opening statement, expert testimony, and closing argument).





[64] Scurlock Oil Co.
v. Smithwick, 724 S.W.2d 1, 4-5 (Tex. 1986)
(holding erroneous admission of Mary Carter agreement harmful as jury found
defendant 100% liable despite strong evidence of decedent=s contributory negligence); see also Spohn Hosp., 104 S.W.3d at 884 (holding sanction
instructing jury to believe one version of contested fact was harmful, as it
was the critical contested fact and there was evidence to the contrary).





[65] 32 S.W.3d 701, 712.





[66] Id. at 712.





[67] Id. at 710.





[68] Id. at 711.





[69] See Gammill v. Jack Williams
Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998); Selig
v. BMW of N. Am., Inc., 832 S.W.2d 95, 99 (Tex. App.CHouston [14th Dist.] 1992, no writ).





[70] Tex. R. App.
P. 61.1(a) (providing that no judgment may be reversed Aunless the Supreme Court concludes that the error
complained of . . . probably caused the rendition of an improper judgment@).





[71] We recognize a comparatively large number of pedal
mistakes might be some evidence of a defective pedal design.  Cf. Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 340-41 (Tex. 1998) (holding
other claims of mismatch between tires and rims admissible to show defendant
knew users were ignoring warnings and misusing product).  But Armstrong makes no such claim here.





[72] See Williams Distributing Co. v. Franklin, 898
S.W.2d 816, 817 (Tex. 1995). 





[73] 32 S.W.3d at 710-11.





[74] Transp. Ins. Co.
v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994).  Armstrong points to one occasion when we
appear to have considered a defendant=s
post-sale knowledge of other accidents. 
In General Motors Corp. v. Sanchez, we noted that the defendant=s experts Aadmitted
they had just testified in a similar case in California.@  997 S.W.2d
584, 596 (Tex. 1999).  But as we did so
in the course of finding no evidence of conscious indifference, id. at
596-98, there was no harm in doing so.





[75] 951 S.W.2d 420, 438 (Tex. 1997).





[76] For the same reason, we need not address Nissan=s argument that a car is not defective solely because
of normal wear and tear of its parts, as Armstrong makes no such claim.





[77] 49 U.S.C. ' 30118(c)(1).





[78] As Armstrong denies making any complaint based on a
post-sale duty, none of her liability claims involves any question of post-sale
recalls.





[79] See Formosa Plastics Corp. USA v. Presidio Eng=rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998) (holding fraud
requires a material representation that defendant intended plaintiff to act
on); Amstadt v. U.S. Brass Corp., 919 S.W.2d
644, 649 (Tex. 1996) (limiting DTPA claims to conduct occurring in connection
with the alleged consumer=s transaction); Fed. Land Bank Ass'n
of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991) (holding negligent
misrepresentation requires a representation Amade by
a defendant in the course of his business, or in a transaction in which he has
a pecuniary interest@). 





[80]
See Crim
Truck & Tractor Co. v. Navistar Int=l Transp. Corp., 823 S.W.2d 591, 593-95 (Tex. 1992).